1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DANIEL CHAVEZ, et al.,<br><br>Defendants. | Case No. 15-CR-00285-LHK<br><br>**ORDER DENYING DEFENDANT VICTOR SKATES'S RENEWED MOTION TO SUPPRESS**<br><br>Re: Dkt. No. 412 |

On June 26, 2018, this Court denied with prejudice in part and without prejudice in part a motion to suppress filed by Defendant Victor Skates ("Skates"). ECF No. 386. As relevant here, the Court ordered the government to produce information regarding an electronic communication court order that was used to locate Skates's phone. *Id.* at 12. The Court also permitted Skates to file a renewed motion to suppress after receiving this information from the government. *Id.*

Presently before the Court is Skates's Renewed Motion to Suppress Evidence Derived from Real-Time Cell Phone Location Data, filed on July 25, 2018 (referred to throughout as "renewed motion to suppress"). ECF No. 412 ("Mot."). As detailed in the procedural background, the parties extensively briefed this motion from August 20, 2018 through September 28, 2018. The

Court held an evidentiary hearing on October 23, 2018. *See* ECF No. 561. Having considered the briefs and declarations, the testimony from the evidentiary hearing, the relevant law, and the record in this case, the Court DENIES Skates's renewed motion to suppress.

# I.  BACKGROUND

## A.  Procedural Background

Skates challenges the propriety of the June 10, 2011 search of his Upland residence. In his previous motion to suppress, filed on May 25, 2018, Skates raised three objections to the search warrant: (1) the search warrant affidavit did not establish probable cause to believe that Skates was associated with the Upland residence, (2) the search warrant affidavit did not adequately explain why the articles sought to be seized were likely to be found in the Upland residence, and (3) probable cause was lacking because the search warrant affidavit improperly relied on an electronic communication court order. ECF No. 386 at 5–6. On June 26, 2018, the Court denied with prejudice Skates's motion on the first two grounds because the search warrant affidavit contained sufficient facts to connect Skates to the Upland residence and to raise a fair probability that the listed items would be found at the Upland residence. *Id.* at 6, 8.

However, the Court denied without prejudice Skates's motion on the third ground. *Id.* at 12. Although the Court found that the officers acted in good faith based on the then-present record, the Court noted that "the record regarding the electronic communication court order [wa]s incomplete." *Id.* at 9. Thus, the Court ordered the government to produce the electronic communication court order and permitted Skates to file a renewed motion to suppress after receiving this information from the government. *Id.* at 12.

Skates filed his renewed motion to suppress on July 25, 2018. *See* Mot. The government filed an opposition on August 20, 2018. ECF No. 447 ("Opp'n"). Skates filed a reply on August 24, 2018. ECF No. 454 ("Reply").

Recognizing that it needed further information to properly rule on the renewed motion to suppress, the Court issued an Order on September 7, 2018, that requested further information and declarations from the government as well as briefing from both parties by September 14, 2018,

regarding the circumstances from which agents at the California Department of Justice, Bureau of Narcotics Enforcement (the "Bureau") obtained Skates's address and details as to whether or how information concerning those methods were disclosed to the Salinas Police Department. ECF No. 475 ("September 7, 2018 Order"). On September 14, 2018, Skates timely responded to the Court's September 7, 2018 Order. ECF No. 482 ("Skates Resp."). The government filed four of its declarations by the September 14, 2018 deadline, but filed a fifth declaration late on September 15, 2018. *See* ECF Nos. 483–84. These declarations included declarations from Bureau Agents Geanie Franco and Luis Marquez, and Salinas Police Department Officer Justin Salinas, Officer Anthony Parker, and Detective James Knowlton. *See id.* The government did not file its brief until September 16, 2018, two days after the Court's deadline. ECF No. 485 ("Govt. Resp."). On September 24, 2018, the Court ordered Skates to file a sur-reply by September 28, 2018. ECF No. 502. Skates filed a timely sur-reply on September 28, 2018, ECF No. 523 ("Sur-Reply").

The Court also held a five-hour evidentiary hearing on October 23, 2018, during which the Court heard testimony from the five law enforcement officers who submitted declarations. *See* ECF No. 561.

Now that the government has produced the relevant information surrounding the Bureau's investigation to locate Skates, Skates's renewed motion seeks to suppress all of the evidence seized during the June 10, 2011 search of his Upland residence. In particular, Skates argues that this evidence is the fruit of the Bureau's unconstitutional collection of real-time location information of Skates's cell phone. *See* Mot; Sur-Reply. The government opposes and argues that the search warrant and subsequent search were valid, or alternatively, that suppression is excused by the good faith exception. *See* Opp; Gov't Resp.

**B. Factual Background**

This matter concerns the cell phone tracking procedures utilized by law enforcement officers, including real-time cell-site location information, pen register and trap and trace device information, and a cell-site simulator device, to locate Skates, his phone, and his address, as well

3

as the subsequent warrant to search Skates's residence at 435 West 9th Street, Apt. C1 in Upland, California ("the Upland residence").

### 1. Law Enforcement Officers Search for Skates for Armed Robbery

The Court discusses first the facts surrounding why law enforcement was looking for Skates. The below facts are from the search warrant affidavit of Salinas Police Department Detective James Knowlton in support of the search warrant to search Skates's residence. ECF No. 352-1 ("Knowlton Aff.").

On November 13, 2009, a robbery occurred at the Alisal Market store in the city of Salinas, California. *Id.* at 8. Two suspects entered the store and demanded that the owner hand over the money. *Id.* One of the suspects pointed a black semi-automatic handgun at the owner while the other suspect took the cash from the cash register and emptied the victim's pockets. *Id.* The robbers took approximately $2,500 during the robbery. *Id.*

Law enforcement obtained surveillance footage from the store. *Id.* In reviewing that footage, Officer Dale Fors of the Salinas Police Department recognized the gun-toting suspect as Skates based on previous contact that Officer Fors had with Skates. *Id.* Officer Fors also identified a tattoo of the number "14" on the suspect's hand and, after further research, confirmed that Skates has that tattoo on his hand. *Id.* (The tattoo is commonly worn by members of the Northern California Norteño gang, as the number "14" represents the fourteenth letter of the alphabet, "N," short for Norteño. *Id.* at 9.) Authorities forwarded the video footage from the robbery to Monterey County Probation Officer Dawn Allen, who had supervised Skates for several years while Skates was on probation. *Id.* at 8. Officer Allen was immediately able to identify the suspect as Skates. *Id.* In light of this information, officers sought and obtained an arrest warrant from the Monterey County Superior Court. *Id.* at 8–9. The Salinas police, however, were unable to locate Skates. *Id.* at 9.

Skates was also identified by a confidential informant as being involved in several other bank and store robberies in the California cities of Watsonville, Gilroy, and Salinas spanning from 2009 to 2011. *Id.* The officers obtained surveillance footage depicting a suspect of similar height

and weight to Skates wearing gray sweatpants, a dark colored hooded sweatshirt, a mask, and dark gloves. *Id.* In the videos, the suspect points a black semi-automatic handgun or a medium to large frame revolver at store employees. *Id.* According to the search warrant affidavit, the manner and method of each robbery was the same, and Skates's clothing was "consistent and virtually unchanged" over the course of two years. *Id.* at 10. Investigators also found property taken during one of the robberies in the possession of Skates's associate, Daniel Chavez. *Id.* at 9.

Based on these facts, authorities believed that Skates was the suspect identified in the armed robberies. *Id.* at 10. Based on this information, an $85,000 arrest warrant was issued for Skates by the Monterey County Superior Court. *Id.* at 9–10. Nevertheless, officers had not located Skates despite active efforts to pursue him for over a year and a half. *Id.* at 9; ECF No. 447-1 ("Salinas 8/17/18 Decl."), Ex. B at 1. At the beginning of June 2011, the Salinas police still had been unable to find Skates. *Id.*

### 2. Salinas Police Department Applies for an Electronic Communication Court Order

In furtherance of the ongoing investigation, on June 8, 2011, Salinas police officers applied for an electronic communication court order pursuant to the Stored Communications Act ("SCA"), 18 U.S.C. § 2703(d). Mot., Ex. B. Pursuant to that statute, law enforcement officers may obtain subscriber or customer records concerning electronic communication service or remote computing service by obtaining a court order on a showing of "specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d).

Officer Justin Salinas of the Salinas Police Department described the circumstances in his application for the § 2703(d) court order. As the application described, a previous investigation of Skates's telephone number by Salinas police officers had proven unsuccessful. Mot., Ex. B at 1. However, on June 7, 2011, a confidential informant provided the officers with a new telephone number for Skates. *Id.* The Salinas Police Department officers determined that the number was

associated with a MetroPCS cell phone and was subscribed to a fictitious name with no address. *Id.* The officers devised a ruse to call the cell phone, and a Spanish-speaking officer spoke in Spanish to a man whom the officers believed to be Skates. *Id.*; *see also* ECF No. 570 ("Hearing Transcript") at 26:10–22. Based on this information, Officer Salinas stated his belief that obtaining records from MetroPCS would provide the whereabouts of Skates. Mot., Ex. B. at 2; Hearing Transcript at 45:6–20.

On June 8, 2011, a judge of the California Superior Court signed the electronic communication court order. Mot., Ex. C at 1. The § 2703(d) electronic communication court order authorized officers to obtain the last outgoing and last incoming phone numbers to Skates's suspected phone. *Id.* Important here, the electronic communication court order also permitted collection of the "[l]ocations, dates, and times of cell tower contacts" from June 6, 2011 at 9:00 a.m. to June 8, 2011 at 9:00 a.m. *Id.* Officer Salinas testified that he believes he requested the relevant cell phone records from MetroPCS on the morning of June 8, 2011. Salinas 8/17/18 Decl. ¶ 5; *see also* Salinas 8/17/18 Decl., Ex. A. The MetroPCS records revealed that Skates's cell phone had connected with a cell tower in Upland, California on June 7, 2011, at approximately 9:35 p.m. Salinas 8/17/18 Decl. ¶ 6.

### 3. Salinas Police Department Contacts the Bureau for Help in Locating Skates

Officer Salinas contacted Bureau Agents Robert Aguirre and Geanie Franco via email on June 8, 2011, at 1:48 p.m., regarding their assistance in locating Skates. Salinas 8/17/18 Decl., Ex. B. Officer Salinas testified he believed that Salinas Police Department Officer Robert Zuniga had contacted the Bureau first, but Officer Salinas clarified that Officer Salinas became "the point of contact." Hearing Transcript at 44:6–13, 51:51–20.

Officer Salinas explained that his June 8, 2011, 1:48 p.m., email to Bureau Agents Robert Aguirre and Geanie Franco provided "a brief synopsis of the case and of Victor Skates and of the efforts that [the Salinas Police Department] had put into it to locate him up until that time." *Id.* at 52:9–15; Salinas 8/17/18 Decl., Ex. B. Officer Salinas provided Skates's cell phone number in that June 8, 2011 email. Salinas 8/17/18 Decl., Ex. B. at 1. Officer Salinas also informed the Bureau

6

agents that Skates was suspected of committing five homicides and seven armed robberies, that Skates had evaded law enforcement for over a year and a half, and that Skates should "be considered armed and extremely dangerous" because confidential informant information suggested that Skates was in possession of two stolen AR-15 rifles. *Id.* In addition, Officer Salinas wrote that "[we] are actively debriefing a CRI who is one of his closest associates who advised that Skates has made statements that he will not go back into custody and will take on law enforcement." *Id.* On June 9, 2011 at 10:18 a.m., Officer Salinas emailed a copy of the Salinas Police Department's electronic communication court order to the Bureau agent supervising the Skates investigation, Agent Aguirre. Salinas 8/17/18 Decl. ¶ 8; *see also id.*, Ex. D.

At the evidentiary hearing, Officer Salinas testified that the Bureau was contacted because of their expertise in cell phone tracking and because they had access to technology not available to the Salinas Police Department. Hearing Transcript at 61:2–9 ("[Y]ou did know that the reason – or did you – that the reason for sending the case there and asking for the assistance of [the Bureau] out of Southern California was that they were accomplished in cell phone technology searches; correct?" "Correct." "And that's something that Salinas Police Department did not have . . . at that time; correct?" "Correct."). Indeed, multiple officers testified that the Bureau was known for its expertise in cell phone tracking. *See, e.g.*, *id.* at 27:3–12, 31:1–19 (Officer Anthony Parker); *id.* at 129:17–22 (Agent Franco).

The Bureau agents involved in Skates's investigation included Agent Aguirre, Agent Franco, and Agent Franco's partner, Agent Luis Marquez. At the evidentiary hearing, Agent Franco explained that in June 2011, she was a Special Agent with the Bureau, and that one of her assignments was with the Special Investigation Unit, which was primarily a cell phone tracking unit that went after fugitives. Hearing Transcript at 108:9–16. Agent Franco's supervisor, Agent Aguirre, handled the requests from other law enforcement officers to the Bureau and then assigned who would work on the requests. *Id.* at 108:20–109:5, 128:22–129:2. Agent Franco testified that she received the request to work on locating Skates from Agent Aguirre. *Id.* at 109:3–8.

Agent Marquez, Agent Franco's partner, testified that in June 2011, he was a part of the Special Investigation Unit. *Id.* at 175:15–16. Agent Marquez testified that he received the Skates assignment from his supervisor, Agent Aguirre. *Id.* at 176:9–15. Agent Marquez explained that because he typically had four or five cases a week, Agent Marquez would collect the information and send it to his supervisor, who was in charge of communicating with the other law enforcement agencies. *Id.* at 215:16–216:5.

On June 8, 2011, Special Agent Franco started working on locating Skates. ECF No. 447-1 ("Franco 8/17/18 Decl.") ¶ 5. Using the cell phone number provided by the Salinas Police Department, Agent Franco, under the authority of the Electronic Communications Privacy Act of 1986 ("ECPA"), 18 U.S.C. § 3125 (the "Pen/Trap Statute"), submitted at 1:31 p.m. on June 8, 2011, an exigent pen register request to MetroPCS to obtain subscriber data and pen register information for Skates's cell phone. *Id.* Agent Franco stated her belief that an emergency situation existed. *Id.* ¶¶ 5–6; *see also id.*, Ex. A. In particular, Agent Franco testified at the evidentiary hearing that she knew Skates "was a homicide suspect with several homicides, he was a Norteño gang member, and that – apparently that he would shoot it out with police and had access to firearms." Hearing Transcript at 109:11–14. Agent Franco further declared she "knew there was an active arrest warrant for Skates based on an armed robbery he was believed to have committed" and that she "was particularly worried at that time about his violent criminal history and apparent easy access to dangerous firearms." Franco 8/17/18 Decl. ¶ 5. Given this emergency, Agent Franco testified that she believed that the exigent pen register request was warranted. Franco 8/17/18 Decl. ¶¶ 5–6; *see also id.*, Ex. A. Agent Franco also testified that she believed an exigent pen register request authorized law enforcement to collect real-time cell-site location information. *Id.* ¶ 6. During her testimony at the evidentiary hearing, Agent Franco clarified that the information obtained from the pen register and trap and trace device included *both* incoming and outgoing numbers from Skates's cell phone *as well as* real-time cell-site location information, which is latitudinal and longitudinal information about the cell towers that the cell phone pings. Hearing Transcript at 152:4–154:18, 160:15–162:5.

8

Within a couple hours of Agent Franco's exigent pen register request, the Bureau "began receiving real-time cell-site location data from MetroPCS." Franco 8/17/18 Decl. ¶ 7.

### 4. The Bureau Searches for Skates on June 9, 2011

At some point on June 9, 2011, Agent Franco and her partner Agent Marquez headed to Upland, California in a surveillance vehicle. Franco 8/17/18 Decl. ¶¶ 10–11; ECF No. 447-3 ("Marquez 8/17/18 Decl.") ¶ 3. Once in Upland, the pair drove around in the surveillance vehicle in search of Skates, while their supervisor, Agent Aguirre, followed from behind. Hearing Transcript at 123:3–9, 163:19–164:12, 177:16–24. During this time, other Bureau surveillance units were also in the area searching for Skates. *Id.* at 179:21–25, 184:4–16; Marquez 8/17/18 Decl. ¶¶ 3–5; ECF No. 483-1 ("Franco 9/14/18 Decl.") ¶¶ 12–13.

Agent Franco testified that while Agent Marquez drove around Upland, she used several different methods, in combination, to try to locate Skates, including the pen register and trap and trace device information, real-time cell-site location information, database checks, physical surveillance, and a cell-site simulator. Franco 9/14/18 Decl. ¶ 7. Agent Franco described the process as follows. While Agent Marquez drove the car from location to location, Agent Franco sat in the passenger seat with a laptop that was gathering incoming and outgoing numbers to Skates's phone as well as cell-site location information through the pen register and trap and trace device. Hearing Transcript at 158:1–162:5, 163:16–164:24. Because cell-site location information in 2011 was not sufficiently precise to identify a target's location, Agent Franco would then enter the information that did come in, such as phone numbers, into records databases to see if she could generate related names or addresses. *Id.* at 114:25–115:5, 163:19–25; Franco 9/14/18 Decl. ¶¶ 8–9. If Agent Franco found an address through the database checks, Agent Marquez would drive to that location, and the pair would radio their supervisor to let him know they found another lead. Hearing Transcript at 163:19–164:12. Agent Franco would continue this process as they drove from location to location. In the meantime, Agent Franco also ran a cell-site simulator to detect if Skates's cell phone was nearby. *Id.* at 159:11–21; Franco 9/14/18 Decl. ¶ 10. According to Agent Franco, a cell-site simulator is technology that effectively acts as a cell tower to trick phones

within a certain radius into connecting with the device rather than a cell tower. Hearing Transcript at 151:20–152:3. If the cell-site simulator "pings," that confirms that the cell phone is using the officer's simulated "tower." *Id.* at 143:11–18; 152:1–3. Agent Marquez echoed Agent Franco's testimony, although he also added that sometimes, when the Bureau team got a lead, they would send out other Bureau "surveillance units to confirm and look at that lead for any follow up." *See id.* at 192:1–17, 197:1–15.

Although the Bureau agents do not remember exactly what got them to Skates, Agent Franco and Agent Marquez testified that at some point on June 9, 2011, the combination of pen register and trap and trace device information, real-time cell-site location information, and database checks yielded the name of an associate of Skates. *Id.* at 124:6–13, 159:1–13; Franco 9/14/18 Decl. ¶ 8; Marquez 9/14/18 Decl. ¶¶ 3–4. Neither Agent Franco nor Agent Marquez recall the name of this associate; however, they both recall that a database check of this associate turned up an address to an apartment complex, which ultimately turned out to be Skates's Upland residence address. Hearing Transcript at 137:11–20, 204:9–13; Franco 9/14/18 Decl. ¶¶ 8, 11; Marquez 9/14/18 Decl. ¶¶ 3–4, 7. The pair then traveled to that address, and radioed the rest of the Bureau team. Hearing Transcript at 179:19–180:3.

Agent Franco and Agent Marquez arrived at the area of the apartment complex, but a gate prevented them from driving their surveillance vehicle inside the property. Marquez 8/17/18 Decl. ¶ 4. Agent Marquez got out of the surveillance vehicle and began conducting physical surveillance by foot. *Id.* Shortly thereafter, Agent Marquez spotted Skates, sitting in a white Ford Explorer in the parking lot of the complex. *Id.*; Franco 8/17/18 Decl. ¶ 11. Agent Marquez radioed the rest of the Bureau surveillance units to let them know that he had spotted Skates. Marquez 8/17/18 Decl. ¶ 5. Agent Marquez then observed Skates drive away from the apartment complex and pass the agent's surveillance vehicle in the process. Hearing Transcript at 184:4–8. At that point, both Agent Franco and Agent Marquez testified that the cell-site simulator pinged for the first time. *Id.*; Franco 9/14/18 Decl. ¶ 13. Agents Franco and Marquez again broadcasted Skates's location to the

other surveillance units, and law enforcement agents pursued Skates and arrested him at a nearby store. Hearing Transcript at 184:10–16; Franco 9/14/18 Decl. ¶ 13.

According to Agent Marquez, he and Agent Franco next approached an address that they believed was Skates's residence based on the records checks. Marquez 8/17/18 Decl. ¶ 6. Agent Marquez spoke with the female occupant, Tera Moran, who explained that she was Skates's girlfriend and the mother of his child. *Id.* Moran confirmed that Skates lived at the Upland residence with her and their child. *Id.* Moran also consented orally and in writing that the officers could enter and search the residence. *Id.*; *see also id.*, Ex. A. The Bureau agents, however, did not initiate a search but instead froze the apartment until Salinas Police Department officers obtained and arrived at the scene to execute a search warrant. Franco 8/17/18 Decl. ¶ 12; Hearing Transcript at 124:14–16. Agent Franco later memorialized what happened in her Investigation Report, dated June 16, 2011. Mot., Ex. D.

### 5. The Legal Authority for the Bureau's Search

In her declaration and at the evidentiary hearing, Agent Franco acknowledged that pursuant to the Pen/Trap Statute, she was required to obtain an order that approved of her use of the pen register and trap and trace device within 48 hours following her June 8, 2011 exigent pen register request. 8/17/18 Franco Decl. ¶14; Hearing Transcript at 125:1–13; *see* 18 U.S.C. § 3125(a), (c). Agent Franco admitted at the evidentiary hearing that she never obtained such an order. Hearing Transcript 126:25–127:25, 128:6–11. Instead, Agent Franco stated that at the time of the investigation, she relied on the § 2703(d) electronic communication court order that was sent to the Bureau by the Salinas Police Department. *See id.* at 125:18–22; Franco 9/14/18 Decl. ¶ 17; Franco 8/17/18 Decl. ¶ 13–14; *see also* Salinas Decl., Ex. D. Agent Franco testified that she believed that the electronic communication order justified her use of the real-time cell-site location information and the cell-site simulator. Hearing Transcript at 172:8–173:9. However, at the time of the investigation, Agent Franco did not read the June 8, 2011 § 2703(d) electronic communication court order to confirm that it authorized her June 9, 2011 search. Franco 8/17/18 Decl. ¶ 13; Hearing Transcript at 127:12–23 ("I just saw the court order and sent it to MetroPCS. I

11

– I feel horrible now because I wasn't paying attention and did that and I feel like we're here because of me."); *Id.* at 128:6–11, 162:6–15 ("I – to be honest, I just saw the order and faxed it over." "Okay. So you didn't read it?" "No."). Agent Franco admitted that she now realizes that the electronic communication court order was limited to the collection of the "[l]ocations, dates, and times of cell tower contacts" *from June 6, 2011 at 9:00 a.m. to June 8, 2011 at 9:00 a.m.*," and did not authorize the collection of real-time or historical cell-site location information on June 9, 2011. *See* Mot., Ex. C at 1 (emphasis added); 8/17/18 Franco Decl. ¶13; Hearing Transcript at 127:4–14, 133:7–18, 134:24–135:21, 162:6–15. When questioned why she herself did not try to obtain an order following her exigent pen register request, Agent Franco testified that it was her belief that Salinas Police Department would be in charge of obtaining the requisite court orders "because they had a fuller understanding of Skates's history and the factual circumstances of his case and because they had been investigating him for a longer period of time." Franco 8/17/18 Decl. ¶ 13; Hearing Transcript at 162:16–163:15. Further, Agent Franco clarified that she did not tell her supervisor, Agent Aguirre, of the search methods by which Agent Franco got information on the location of Skates because she believed there "was no need to" because Agent Franco understood that Agent Aguirre already "knew" what everyone's role on the Bureau's Team was. Hearing Transcript at 132:25–133:4, 142:8–18; 163:9–164:16.

### 6. Salinas Police Department Officers Obtain a Warrant and Search Skates's Residence

Salinas Police Department Officer Salinas, Officer Anthony Parker, and Detective Knowlton submitted declarations and testified at the October 23, 2018 evidentiary hearing. Officer Salinas and Officer Parker also testified that they worked with a Salinas Police Department Officer named Robert Zuniga, who was a junior officer and part of the violence suppression unit. Hearing Transcript at 29:10–13, 42:21–43:1. Officer Zuniga did not submit a declaration or testify at the October 23, 2018 evidentiary hearing.

Officer Salinas testified that he is a gang investigator with the violence suppression unit within the Salinas Police Department, and he worked in that unit in June of 2011. *Id.* at 38:18–39:

10. During the time of Skates's arrest, Officer Salinas was working as a gang enforcement officer with the main objective to investigate gangs within the City of Salinas. *Id.* at 39:11–21. In June of 2011, Officer Salinas and his unit were investigating Skates for multiple armed robberies, homicides, and attempted homicides. *Id.* at 41:1–8. Officer Salinas's partner was Officer Parker. Hearing Transcript at 25:3–4. In June of 2011, Officer Parker was also assigned as a gang investigator to the violence suppression unit. *Id.* at 24:12–16.

Detective Knowlton testified that in June 2011, he was working in the Investigation Bureau as a Detective within the Salinas Police Department. *Id.* at 85:24–86:17. In this capacity, Detective Knowlton explained that he was typically assigned to cases that had more complicated investigative elements to them, like murders or attempted murders, and he often participated in gang investigations. *Id.* at 86:4–14. On June 9, 2011, Detective Knowlton was working on his regular caseload when about mid-day he was informed that the Salinas Police Department had a special assignment for him. This assignment was to begin writing a search warrant in the event that Skates was located. *Id.* at 86:19–87:15.

The record shows that at some point in the early evening of June 9, 2011, the Bureau informed the Salinas Police Department that the Bureau had (1) taken Skates into custody at approximately 5:00 p.m., only a little more than 24 hours since Officer Salinas had sent his case synopsis email to the Bureau; and (2) determined the location of Skates's residence. Salinas 8/17/18 Decl. ¶ 9. Specifically, the record reflects that Agent Franco's supervisor, Bureau Agent Aguirre, contacted Salinas Police Department Officer Salinas to inform Officer Salinas that the Bureau had located and arrested Skates as well as determined Skates's address in Upland. ECF No. 483-3 ("Salinas 9/14/18 Decl.") ¶ 3; Hearing Transcript at 54:15–55:4.

Officer Salinas testified that he does not recall whether or not Agent Aguirre told Officer Salinas about the investigative methods the Bureau used to locate Skates. *See id.* at 55:5–22; Salinas 9/14/18 Decl. ¶ 4, 8. However, Officer Salinas acknowledged that he was aware that the Bureau typically employed methods that "involved cell phone technology." Hearing Transcript at 65:23–25. Although Officer Salinas acknowledged that he recalls learning at some point that the

Bureau used a cell-site simulator, he does not recall from whom or when he learned that information, and he testified that he believed that Bureau agents had the requisite legal authority to use the cell-site simulator. *Id.* at 58:1–14; Salinas 9/14/18 Decl. ¶¶ 6, 11. Moreover, the Bureau's cell-site simulator pinged for the first time only *after* the Bureau located Skates, meaning the cell-site simulator did not contribute new information in the search for Skates and his residence. Hearing Transcript at 184:4–8; Franco 9/14/18 Decl. ¶ 13.

Officer Salinas also recalled sending the electronic communication court order to the Bureau's Agent Aguirre early on June 9, 2011, at around 10:48 a.m. Hearing Transcript at 58:8–23; Salinas 8/17/18 Decl. ¶ 8; Salinas 8/17/18 Decl., Ex. D. Officer Salinas testified that he was not aware of whether the Bureau used or expanded upon this court order. Hearing Transcript at 58:1–14.

Officer Salinas told his partner, Officer Parker, that the Bureau had arrested Skates and determined Skates's address in Upland. Salinas 9/14/18 Decl. ¶ 9. Officer Salinas testified that he does not recall informing Officer Parker about the Bureau's use of a cell-site simulator or real-time cell-site location information. *Id.* ¶ 10; Hearing Transcript at 57:9–21.

Officer Salinas also testified that he may have had a quick conversation with Detective Knowlton, but that from the best of his recollection, he did not inform Detective Knowlton about the Bureau's methods, and that Officer Parker was ultimately the one to speak to Detective Knowlton about the Bureau's locating and arresting Skates. Salinas 9/14/18 Decl. ¶ 9; *see also* Hearing Transcript at 56:11–57:8, 65:7–14.

Officer Parker confirmed that he received updates about the Bureau's efforts from Officer Salinas. ECF No. 483-4 ("Parker Decl.") ¶ 3. Officer Parker also testified that he spoke to Officer Zuniga, who Officer Parker believed was in contact with the Bureau. *Id.*; Hearing Transcript 29:7–15. Both Officer Salinas and Officer Parker indicated that they believed that Officer Zuniga first contacted the Bureau for assistance in locating Skates. *See id.* at 26:23–27:3, 51:15–18, 52:9–15. However, Officer Salinas clarified that Officer Salinas became "the point of contact." *Id.* at 44:6–

13, 51:51–20. Officer Salinas emailed the case synopsis and the Salinas Police Department's § 2703(d) electronic communication order to the Bureau. Salinas 8/17/18 Decl., Exs. B & D.

In any event, Officer Parker testified that he learned that the Bureau had located Skates and Skates's phone. Officer Parker testified that he learned that the Bureau was "employing some sort of technology, to locate Mr. Skates's cell phone," but that Officer Parker did not receive specific information about the methods the Bureau used, including whether the Bureau had utilized real-time cell-site location information. Parker Decl. ¶¶ 3–6, 9; Hearing Transcript at 29:7–25, 37:5–13. Instead, Officer Parker recalls learning only that the Bureau had a surveillance vehicle, and that Bureau agents had physically seen Skates in a white Ford Explorer before they arrested him near an apartment complex in Upland. Parker Decl. ¶¶ 5–6; Hearing Transcript at 28:18–24. Officer Parker provided updates to Detective Knowlton, including that the Bureau had located and arrested Skates and determined his address. Parker Decl. ¶ 7; Hearing Transcript at 28:25–29:6.

As explained, Detective Knowlton was tasked mid-day on June 9, 2011, with writing the warrant affidavit, so that if Skates was arrested, the other Salinas Police Department officers, including Officer Salinas, could drive the more than 300 miles to Upland to execute a search warrant at the Upland residence. Salinas 8/17/18 Decl. ¶ 10; Hearing Transcript at 86:19–88:17, 101:6–25. At the evidentiary hearing, Detective Knowlton further explained the division of labor between him in his role as a detective, and Officer Salinas, Officer Parker, and the rest of the violence suppression unit in the Salinas Police Department: "[the violence suppression unit] work[s] in a separate office, [the violence suppression unit] ha[s] a small team, they were being told that they may be heading to Southern California . . . . Normally [the violence suppression unit] wrote their own [search warrants] unless it was a very complicated situation or there was some factor that [the violence suppression unit] wanted a detective to help them." Hearing Transcript at 100:21–101:5. "In this case, because [the violence suppression unit] team, a small team, may be having to pack up their stuff, hop in patrol cars and drive to Southern California if Mr. Skates was located, I think that's why I was tasked with beginning the search warrant, because they were likely going to be on the highway." *Id.* at 101:6–10. "I was going to be the one that was

going to be near a town if it happened in the middle of the night, so I could respond back to the police department to finish it, to find a district attorney to review it, to find a judge who would sign it." *Id.* at 101:17–20.

Detective Knowlton testified that he received his information about the Bureau's investigation from Officer Parker. ECF No. 484-1 ("Knowlton Decl.") ¶ 5; Hearing Transcript at 87:1–15, 94:16–20. Detective Knowlton did not speak to Bureau agents. Knowlton Decl. ¶ 5; Hearing Transcript at 94:11–15. Detective Knowlton learned only that the Bureau had used a cell phone number connected to Skates to assist them in locating Skates, that the Bureau utilized undercover agents and a surveillance vehicle, and that the Bureau had arrested Skates and determined Skates's address in Upland. Knowlton Decl. ¶¶ 5, 7, 9; Hearing Transcript at 89:1–15, 90:1–25. Detective Knowlton also learned that there was an electronic communication court order, but Detective Knowlton explained that he did not know the specifics of the order or what it authorized. Hearing Transcript at 90:1–5, 103:5–104:21. Officer Parker also provided the exact Upland address to Detective Knowlton. Knowlton Decl. ¶ 10. Detective Knowlton testified that he did not learn of any other methods, including whether the Bureau had utilized real-time cell-site location information or a cell-site simulator device. *Id.* ¶ 9; Hearing Transcript at 91:6–19. He also testified that he had no reason to think that the Bureau had not lawfully located Skates and his residence. Hearing Transcript at 103:9–11 ("I didn't know what type of order it was, and I never – I never thought a second thought about it, that something hadn't been adhered to because he had been located."); *see also id.* at 105:20–21 ("I don't have any information at this time that suggests that anyone violated the law.").

In the evening of June 9, 2011, after receiving confirmation of Skates's specific address from Officer Parker, Detective Knowlton finalized the search warrant affidavit for the Upland residence only a few hours after he had been asked to write the affidavit. Knowlton Decl. ¶ 10. That search warrant affidavit detailed Skates's affiliation with the Norteño gang as well as particular items of evidence sought to be obtained from the Upland residence. Knowlton Aff. at 9–10. The affidavit also explained that there was an $85,000 arrest warrant issued for Skates for the

Alisal Market robbery. *Id.* at 9. Most relevant here, Detective Knowlton's search warrant affidavit provided:

> An electronic communication court order was obtained in an attempt to locate the Skates phone on June 7, 2011.[1] On June 9, 2011 Agents from California Department of Justice Bureau of Narcotics Enforcement located Skates and his telephone at 435 W. 9th Street Apt. #C1 in Upland, CA and arrested him for his warrant. Skates's girlfriend and the mother of his child, Tera Moran, said Skates, their child, and her live at the residence where he was arrested.

*Id.* at 10. Detective Knowlton submitted the search warrant affidavit to Judge Sam Lavorato, Jr. of the Monterey County Superior Court on the night of June 9, 2011. *Id.* at 5, 11; Knowlton Decl. ¶ 10. Judge Lavorato signed the search warrant the next day, on June 10, 2011, sometime after midnight. Knowlton Aff. at 5; Salinas 8/17/18 Decl. ¶ 10. After the warrant was signed, at approximately 1:00 a.m., an hour after midnight and eight hours after Skates's arrest, Officer Salinas and the other Salinas police officers who had driven to Upland "executed the search warrant and conducted a search of [the Upland residence]." Salinas 8/17/18 Decl. ¶ 10.

## II.     LEGAL STANDARD

The Fourth Amendment of the U.S. Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. As a general matter, the exclusionary rule applies to "primary evidence obtained as a direct result of an illegal search" as well as "evidence later discovered and found to be derivative of an illegality." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). However, because exclusion of evidence hinders the truth-seeking process, courts generally must weigh whether the "deterrence benefits" of applying the exclusionary rule "outweigh [the] substantial social costs." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (internal quotation marks and citation omitted).

---

[1] Detective Knowlton incorrectly identified June 7, 2011 as the day the electronic communication court order was obtained; the electronic communication court order was obtained on June 8, 2011.

Case No. 15-CR-00285-LHK
ORDER DENYING DEFENDANT VICTOR SKATES'S RENEWED MOTION TO SUPPRESS

United States District Court
Northern District of California

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978); *see also United States v. Willis*, 431 F.3d 709, 715 n.5 (9th Cir. 2005) ("The defendant has the burden of proof on a motion to suppress evidence."); *United States v. Caymen*, 403 F.3d 1196, 1199–2000 (9th Cir. 2005). "Initially, the defendant who shows that he was the victim of an unconstitutional search must go forward with specific evidence demonstrating taint." *United States v. Cella*, 568 F.2d 1266, 1284–85 (9th Cir. 1977); *United States v. Kandik*, 633 F.2d 1334, 1335 (9th Cir. 1980) ("[A] defendant has the initial burden of establishing a factual nexus between the illegality and the challenged evidence."). Once the defendant satisfies his burden, "[t]he burden then shifts to the government to show that it acquired its evidence from an independent source," *Cella*, 568 F.2d at 1285, or that another exception, such as the good faith exception, applies, *United States v. Michaelian*, 803 F.2d 1042, 1048 (9th Cir. 1986) ("The government, not the defendant, bears the burden of proving that its agents' reliance upon the warrant was objectively reasonable."); *see also United States v. Camou,* 773 F.3d 932, 944 (9th Cir. 2014) ("When the officer executing an unconstitutional search acted in 'good faith,' or on 'objectively reasonable reliance,' the exclusionary rule does not apply. . . . The burden of demonstrating good faith rests with the government."). The standard of proof for either party "should impose no greater burden than proof by a preponderance of the evidence." *Nix v. Williams*, 467 U.S. 431, 444 & n.5 (1984).

## III.   DISCUSSION

### A.  The Bureau's Search Failed to Comply with the 2011 Statutory Authority

Although it took several rounds of briefing and an evidentiary hearing to determine how the Bureau located Skates, it ultimately became clear that Bureau Agents Franco and Marquez located Skates and his residence in Upland through a combination of methods that included the use of real-time cell-site location information, a pen register and trap and trace device, and a cell-site simulator, as well as information from a confidential informant, surveillance, and database checks. *See, e.g.*, Franco 9/14/18 Decl. ¶ 7; Hearing Transcript at 158:1–162:5, 163:16–164:24.

18

Skates contends that the Bureau violated his Fourth Amendment rights when the Bureau without a warrant obtained real-time location information for Skates's cell phone on June 9, 2011. Mot. at 1–3. More specifically, Skates contends that Agent Franco utilized a combination of real-time cell-site location information; a pen register and trap and trace device; and a cell-site simulator to locate Skates's address and location without legal authorization. Sur-Reply at 13–14. Skates argues that the Bureau cannot rely on the exigent pen register and trap and trace device because the officers did not comply with the relevant provision of the Pen/Trap Statute requiring that officers obtain a court order within 48 hours of installation or use of the pen register or trap and trace device. Reply at 8 (citing 18 U.S.C. § 3125(a), (c)). Similarly, Skates points out that the § 2703(d) electronic communication court order was inapplicable to these three methods because that order explicitly allowed only collection of cell-site location information from June 6, 2011 at 9:00 a.m. to June 8, 2011 at 9:00 a.m. *Id.* at 6; Sur-Reply at 13–14. Thus, Skates concludes that all of the evidence seized during the June 10, 2011 search of his Upland residence must be suppressed as derivative of the unconstitutional search of his cell phone. Mot. at 1–2.

Seven years after the Bureau's search for and arrest of Skates, the United States Supreme Court decided *Carpenter v. United States*, 138 S. Ct. 2206 (2018). In that June 2018 decision, the Supreme Court held that an individual maintains a legitimate expectation of privacy in the records of his physical movements as captured through cell-site location information such that the government's acquisition of that information is a search generally requiring a warrant supported by probable cause under the Fourth Amendment. *Id.* at 2217, 2221. However, *Carpenter* was not the state of the law when law enforcement officers arrested Skates in 2011. Therefore, the Court explains the statutory framework under which the law enforcement officers were operating at the time of Skates's arrest. Ultimately, the Court agrees with Skates that the Bureau did not comply with the law in 2011.

### 1. The Pen/Trap Statute

The Pen/Trap Statute, Title III of the ECPA, 18 U.S.C. § 3125, provides that in emergency situations, officers may install and use a pen register or trap and trace device before obtaining an

19

order authorizing such installation. 18 U.S.C. § 3125(a). An officer who obtains an exigent pen register, however, must obtain an order within 48 hours after the installation has occurred that approves of the installation or use. *Id.* Such an order shall be ordered "if the court finds that the attorney for the Government has certified to the court that the information likely to be obtained by such installation and use is relevant to an ongoing criminal investigation." 18 U.S.C. § 3123. The statute provides that "[t]he knowing installation or use by any investigative or law enforcement officer of a pen register or trap and trace device pursuant to subsection (a) without application for the authorizing order within forty-eight hours of the installation shall constitute a violation of this chapter." 18 U.S.C. § 3125(c).

In 1994, Congress passed the Communications Assistance of Law Enforcement Act ("CALEA"), which amended certain provisions of the ECPA. In particular, the CALEA explicitly prohibits service providers from disclosing the physical location of the subscriber when the government seeks the information only on the basis of the Pen/Trap Statute. 47 U.S.C. § 1002(a)(2)(B) ("[W]ith regard to information acquired solely pursuant to the authority for pen registers and trap and trace devices . . . , such call-identifying information shall not include any information that may disclose the physical location of the subscriber (except to the extent that the location may be determined from the telephone number.)").

Here, Bureau Agent Franco acted under the Pen/Trap Statute in pursuing her exigent pen register request on June 8, 2011. Franco 8/17/18 Decl. ¶ 5. Agent Franco testified that she utilized a pen register and trap and trace device in conducting her search for Skates on June 9, 2011. *See* Franco 9/14/18 Decl. ¶ 7. Agent Franco acknowledged that she understood that she was required to obtain an order within 48 hours following her installation of a pen register and trap and trace device. 8/17/18 Franco Decl. ¶ 14; Hearing Transcript at 125:1–13. Despite relying on the Pen/Trap Statute to conduct her search, however, Agent Franco admitted she did not obtain an order pursuant to the statute within 48 hours after her installation. Franco 8/17/18 Decl. ¶ 13; Hearing Transcript at 126:25–127:25, 128:6–11. Therefore, the Court finds that Agent Franco did not comply with the Pen/Trap Statute. Instead, Agent Franco purports to have relied on 18 U.S.C.

20

§ 2703(d) to justify her exigent pen register request, as discussed below.

Moreover, both Agent Franco and Agent Marquez testified that the information Agent Franco received from the pen register and trap and trace device included not just incoming and outgoing phone numbers, but also geographic coordinates, meaning the pen register and trap and trace device were supplying real-time cell-site location information. *Id.* at 152:4–154:18; 192:6–194:25. However, even under the law in 2011, the CALEA prohibited service providers from disclosing cell-site location information on the basis of the Pen/Trap Statute. *See* 47 U.S.C. § 1002(a)(2)(B).

### 2. Cell-Site Location Information and 18 U.S.C. § 2703(d)

As discussed, the United States Supreme Court in June of 2018 held in *Carpenter* that an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through historical cell-site location information. 138 S. Ct. 2206. In so holding, however, the Supreme Court acknowledged the limitations of its holding and that it specifically did not address real-time cell-site location information. *Id.* at 2220. Post-*Carpenter*, the government must obtain a warrant supported by probable cause to access historical cell-site location information unless an exception to the exclusionary rule applies. Eventually, the same may be expected of real-time cell-site location information, where an individual has arguably an even greater expectation of privacy. *See, e.g.*, *United States v. Ellis*, 270 F. Supp. 3d 1134, 1145–46 (N.D. Cal. 2017) (holding "that cell phone users have an expectation of privacy in their cell phone location in real time and that society is prepared to recognize that expectation as reasonable"); *see also United States v. Cooper*, No. 13-cr-00693-SI-1, 2015 WL 88157, at *3–9 (N.D. Cal. Mar. 2, 2015) (finding that a showing of probable cause is required to obtain prospective, or real-time, cell-site data); *In re Application for Tel. Info. Needed for a Criminal Investigation*, 119 F. Supp. 3d 1011, 1022 (N.D. Cal. 2015) ("[L]ocation data generated by cell phones, which are ubiquitous in this day and age, can reveal a wealth of private information about an individual.").

Case No. 15-CR-00285-LHK
ORDER DENYING DEFENDANT VICTOR SKATES'S RENEWED MOTION TO SUPPRESS

1    Prior to *Carpenter*, some courts held that officers could obtain cell-site location

2 information pursuant to 18 U.S.C. § 2703(d). Specifically, in 2011, some courts held that 18

3 U.S.C. § 2703(d), which was enacted in 1986 as Title II of the ECPA, could authorize the

4 government's searches for cell-site location information. Section 2703(c) of that statute permits

5 governmental entities to "require a provider of electronic communication service or remote

6 computing service to disclose a record or other information pertaining to a subscriber to or

7 customer of such service (not including the contents of communications) only when the

8 governmental entity . . . (B) obtains a court order for such disclosure under subsection (d) of this

9 section." 18 U.S.C. § 2703(c)(1)(B). The SCA provides that a court order may issue only "if the

10 governmental entity offers specific and articulable facts showing that there are reasonable grounds

11 to believe that the contents of a wire or electronic communication, or the records or other

12 information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. §

13 2703(d). The "specific and articulable facts" standard set forth in § 2703(d) requires a showing

14 that is less than probable cause. *In re Application for Tel. Info. Needed for a Criminal*

15 *Investigation*, 119 F. Supp. 3d at 1016.

16    As this Court explained in its previous order in the instant case, even assuming the United

17 States Supreme Court's June 22, 2018 decision in *Carpenter*, 138 S. Ct. 2206 (2018), "would

18 invalidate the search authorized by the June [8], 2011 electronic communication court order in the

19 instant case," there was no "binding authority from either the Ninth Circuit or U.S. Supreme Court

20 that would have controlled when the officers sought and obtained that order [under the SCA] in

21 June 2011, seven years before the U.S. Supreme Court's June 2018 decision in *Carpenter*." ECF

22 No. 386 at 11. at 10; *see United States v. Blake*, No. 16-CR-00111-JBA, 2018 WL 3974716, at *2

23 (D. Conn. Aug. 20, 2018) (collecting cases that have "declined to suppress evidence arising out of

24 a pre-*Carpenter*, routine acquisition of cell-site location information pursuant to the Stored

25 Communications Act"). Thus, courts have not suppressed evidence obtained without a warrant

26

27

when the evidence was obtained pre-*Carpenter* pursuant to the SCA.[2]

Turning to the instant motion, on June 8, 2011, Salinas Police Department Officer Salinas applied for and obtained an electronic communication court order pursuant to the SCA, 18 U.S.C. § 2703(d). Mot., Exs. B & C. The electronic communication court order was signed on June 8, 2011, and authorized Salinas Police Department officers to obtain the last outgoing and last incoming phone numbers to Skates's suspected phone as well as the collection of the "[l]ocations, dates, and times of cell tower contacts" from June 6, 2011 at 9:00 a.m. to June 8, 2011 at 9:00 a.m. Mot., Ex. C at 1. The Salinas Police Department officers then acted properly under this order in obtaining the information that Skates's cell phone had connected with a cell tower in Upland during that specific time period. *See, e.g.*, *Cooper*, 2015 WL 881578, at *9 (holding that the good faith exception applied when investigators had obtained historical and prospective cell-site data with a court order rather than a search warrant); *United States v. Williams*, No. 13-cr-00764-WHO-1, 2016 WL 492934, at *1 (appeal filed) (holding that the good faith exception applied when officers obtained historical cell-site location information pursuant to an order under the SCA, 18 U.S.C. § 2703, rather than a search warrant).

---

[2] *See, e.g.*, *United States v. Curtis*, 901 F.3d 846, 848–49 (7th Cir. 2018) ("'There is nothing to indicate that applying the exclusionary rule to evidence seized pursuant to the statute prior to the declaration of its invalidity will act as a significant, additional deterrent.' . . . We conclude, therefore, that even though it is now established that the Fourth Amendment requires a warrant for the type of cell-phone data present here, exclusion of that information was not required because it was collected in good faith."); *United States v. Chambers*, No. 16-163-CR, 2018 WL 4523607, at *3 (2d Cir. Sept. 21, 2018), *cert. denied*, No. 18-7184, 2019 WL 660085 (Feb. 19, 2019) ("Thus, we conclude that . . . before *Carpenter*, it was objectively reasonable for authorities to think that if they complied with the SCA, no warrant based on probable cause was constitutionally required to obtain cell-site information from a third party."); *United States v. Joyner*, 899 F.3d 1199, 1205 (11th Cir. 2018) ("Here, the Government complied with the requirements of the SCA in obtaining the orders to compel cell site records, and when they did so in June 2015, that warrantless procedure was, under this Court's precedent, within the bounds of the Fourth Amendment."); *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 278 (2018) (holding that *Carpenter* does not affect cases where investigators "relied on court orders and the Stored Communications Act in obtaining the cell site records"); *United States v. Goldstein*, 914 F.3d 200, 204 (3d Cir. 2019) ("The good faith exception applies to the government's search in this case because the government acted upon an objectively reasonable, good faith belief that obtaining Goldstein's CSLI under Section 2703(d) was legal. At the time the search was executed, it was authorized under Section 2703(d). The government complied with all requirements of Section 2703(d) and obtained a valid judicial order to collect Goldstein's CSLI.").

23

However, Agent Franco did not obtain her own § 2703(d) order. Therefore, Agent Franco did not herself comply with the requirements of 18 U.S.C. § 2703(d). Agent Franco testified that she relied on the Salinas Police Department's electronic communication court order because she thought the order justified her use of the exigent pen register request. Hearing Transcript at 126:25–127:25, 128:6–11. However, as stated above, the order did not authorize the collection of *any* cell-site location information on June 9, 2011. Thus, Agent Franco could not rely on the § 2703(d) electronic communication court order for her June 9, 2011 search because the order had expired on its face on June 8, 2011 at 9:00 a.m. *See* Mot., Ex. C at 1. The government does not contest this fact. *See* Opp'n at 11 ("[T]he [electronic communication court] order did not authorize the collection of real-time location data after 9:00 a.m. on 6/8/11, and [Bureau] agents were obtaining real-time data for Skate's cell phone after that time.").

In light of this, the Court concludes that Agent Franco failed to comply with the requirements of the Pen/Trap Statute and 18 U.S.C. § 2703(d) in conducting her search for Skates and his residence.

**B. The Good Faith Exception**

Despite Agent Franco's failure to comply with the statutory authority at the time of her search, the government argues that the good faith of Agent Franco, as well as that of the Salinas Police Department, excuses any Fourth Amendment violation. Opp'n at 6–13; Gov't Resp. at 7–11. On this basis, the government urges the Court not to suppress the items found in Skates's residence.

The good faith exception recognizes that the exclusionary rule is designed "to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *United States v. Calandra*, 414 U.S. 338, 347 (1974); *see also Streiff*, 136 S. Ct. at 2063. Where an officer acts in an objectively reasonable manner, "[e]xcluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty." *United States v. Leon*, 468 U.S. 897, 920 (1984). Thus, cases often look to the culpability of the officers as a means of measuring whether exclusion will promote the

24

requisite deterrence. "When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Davis v. United States*, 564 U.S. 229, 238 (2011). By contrast, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Id.* at 238 (citations and internal quotation marks omitted); *see also Herring v. United States*, 555 U.S. 135, 143, 150 (2009) (holding that the exclusionary rule's concerns are not raised when the "error was the result of isolated negligence attenuated from the arrest"); *Illinois v. Krull*, 480 U.S. 340, 48–49 (1987) ("[E]vidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" (citation omitted)).

In the section that follows, the Court explains that, pursuant to *Davis*, Agent Franco's search for Skates and his residence was negligent, but also isolated, such that any deterrence rationale loses much of its force. In particular, the facts show that the Salinas Police Department had no knowledge and may not be charged with knowledge of Agent Franco's negligence and that the Salinas Police Department acted in good faith in procuring and executing the search warrant. The Court first discusses Agent Franco's culpability in her search for Skates and his residence. The Court second discusses the process by which the Salinas Police Department obtained and executed the warrant to search Skates's residence.

### 1. Agent Franco's Culpability

Even though Agent Franco violated both the Pen/Trap Statute and 18 U.S.C. § 2703(d), the government argues that Agent Franco's violation is excused by her good faith reliance on both statutes. Opp'n at 6–13; Hearing Transcript at 225:14–22; *see also Krull*, 480 U.S. at 349–56 (holding that the "good faith" doctrine applies to "an officer acting in objectively reasonable reliance on a statute" authorizing a warrantless search or seizure of evidence). The Court disagrees.

First, the record is clear that Agent Franco did not fully comply with the Pen/Trap Statute because Agent Franco did not obtain an order authorizing her use of the pen register and trap and trace device within 48 hours after installation. Hearing Transcript at 126:25–127:25, 128:6–11. Instead, Agent Franco thought the § 2703(d) electronic communication court order from the Salinas Police Department constituted the order she was required to obtain under the Pen/Trap Statute. Therefore, the government's good faith argument hinges on whether Agent Franco's belief that the § 2703(d) electronic communication court order sent by the Salinas Police Department authorized Agent Franco's collection of real-time data for Skates's cell phone under Pen/Trap Statute was reasonable. Opp'n at 9–12; Gov't Resp. at 10–11.

The Court finds that Agent Franco did not reasonably rely on the § 2703(d) electronic court communication order that she received from the Salinas Police Department on June 9, 2011. Although Agent Franco's testimony at the evidentiary hearing was credible, it casts doubt on her competence. Importantly, Agent Franco testified that it was her understanding of the law in June 2011 that a Pen/Trap Statute order could authorize the collection of real-time incoming and outgoing calls from the target phone as well as the collection of real-time cell-site location information. Hearing Transcript at 171:5–173:18. As discussed above, even under the law in 2011, the CALEA prohibited service providers from disclosing physical location information on the basis of the Pen/Trap Statute. *See* 47 U.S.C. § 1002(a)(2)(B).

As for the § 2703(d) electronic communication court order, Agent Franco admitted that at the time she received the § 2703(d) electronic communication court order, she did not read it. As Agent Franco stated at the evidentiary hearing: "I just saw the court order and sent it to MetroPCS. I – I feel horrible now because I wasn't paying attention and did that, and I feel like we're here because of me." Hearing Transcript at 127:12–23. She also stated: "I – to be honest, I just saw the order and faxed it over." *Id.* at 162:6–15. When the Court asked Agent Franco if she read the order, Agent Franco responded "No," she had not. *Id.* Instead, Agent Franco just assumed that the electronic communication court order constituted the order she was required to obtain 48 hours after her use of the pen register and the trap and trace device pursuant to the Pen/Trap Statute.

United States District Court
Northern District of California

Franco 8/17/18 Decl. ¶ 13. Had she read the electronic communication court order, however, Agent Franco would have immediately realized that the order was confined to the collection of cell-site location information from June 6 to June 8, 2011, and that it had expired on its face on June 8, 2011, the day *before* Agent Franco searched for Skates and his residence. Mot., Ex. C at 1.

The United States Supreme Court has directed lower courts to look at the culpability of the officer to determine whether the officer has acted deliberately, recklessly or with gross negligence. *See Davis*, 564 U.S. at 238 (directing courts to look at the culpability of the officer, including whether the officer acts with "'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights"); *see also Herring*, 555 U.S. at 145–46 (same). The Court concludes that Agent Franco's failure to apply for a Pen/Trap Statute order within 48 hours, failure to apply for a § 2703(d) order for cell-site location information, and failure to read the expired § 2703(d) electronic communication court order was negligent.

Moreover, Agent Franco's actions were even more unreasonable in light of the fact that one of her assignments was with the Special Investigation Unit, which was primarily a cell phone tracking unit. Hearing Transcript at 108:14–16. As Agent Franco testified at the evidentiary hearing, the Bureau had tools that other agencies did not have and as a result would offer their cell phone tracking services to other agencies. *Id.* at 129:16–25. Considering her assignment, Agent Franco should have been aware of, should have fully understood, and should have been expected to comply with the statutes under which she conducted her searches.

Finally, although Agent Franco's belief that she could rely on the § 2703(d) electronic communication court order casts doubt on Agent Franco's competence, it did appear to be a sincere belief. The Court found Agent Franco's testimony credible. The Court does not doubt that Agent Franco's mistaken views were held in good faith. Moreover, the Court recognizes that Agent Franco acted in a short period of time in a fast-paced situation that she considered to be urgent. Nonetheless, the United States Supreme Court has clarified that subjective good faith alone is not the test. *See Beck v. State of Ohio*, 379 U.S. 89, 97 (1964). Were it, "the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses,

papers, and effects,' only in the discretion of the police." *Id.*; *see also United States v. Lopez-Soto*, 205 F.3d 1101, 1106 (9th Cir. 2000) ("We have no doubt that Officer Hill held his mistaken view of the law in good faith, but there is no good-faith exception to the exclusionary rule for police who do not act in accordance with governing law.").

In light of the above, the Court concludes that Agent Franco did not act in good faith when she relied on real-time cell-site location information from Skates's cell phone to search for Skates and his residence on June 9, 2011.

### 2. The Salinas Police Department's Warrant Was Obtained and Executed in Good Faith and the Exclusionary Rule Does Not Apply

For the reasons discussed below, the Court finds that Agent Franco's negligence was isolated and that Salinas Police Department officers did not have knowledge and may not be charged with knowledge of Agent Franco's negligence. Thus, pursuant to *Davis*, any deterrence benefits from suppression do not outweigh the costs of suppression. *See Davis*, 564 U.S. at 238 ("[W]hen the police act with objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." (citations omitted)); *United States v. Henderson*, 906 F.3d 1109, 1117 (9th Cir. 2018) ("The exclusionary rule applies only when 'police conduct [is] sufficiently deliberate that exclusion can meaningfully deter it and sufficiently culpable that such deterrence is worth the price paid by the justice system.'" (citing *Herring*, 555 U.S. at 144)); *see also id.* ("The exclusionary rule does not apply 'when law enforcement officers have acted in objective good faith or their transgressions have been minor,' because 'the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system.'" (quoting *Leon*, 468 U.S. at 908)). *Franks v. Delaware*, 438 U.S. 154, 170 (1978) (explaining that the exclusionary rule does not extend "beyond instances of deliberate misstatements, and those of reckless disregard" to instances where an officer was "merely negligent in checking or recording the facts relevant to a probable-cause determination."); *Krull*, 480 U.S. at 348–49 ("[E]vidence should be suppressed 'only if it can be said that the law

enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" (citation omitted)).

In the sections that follow, the Court first discusses the significance of the Salinas Police Department having obtained a warrant. Second, the Court reviews the facts demonstrating that Salinas Police Department officers had no knowledge and may not be charged with knowledge of Agent Franco's negligence. Third, the Court discusses why the isolated nature of Agent Franco's negligence makes suppression inappropriate in this case. Finally, the Court discusses the good faith of the executing officers.

### a. The Search Was Executed Pursuant to a Warrant

As an initial matter, *Leon* created a presumption that when an officer relies upon "a warrant issued by a magistrate," that "normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Leon*, 468 U.S. at 922 (internal quotation marks and citation omitted). Here, because the Salinas Police Department searched Skates's residence pursuant to a warrant, that presumption applies subject to exceptions, which collectively ask whether "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Luong*, 470 F.3d 989, 902 (9th Cir. 2006).

Although the inquiry is fact specific, the United States Supreme Court has identified the following exceptions to the presumption of good faith reliance on a warrant issued by a magistrate: "(1) when the affiant knowingly or recklessly misleads the judge with false information; (2) when the judge wholly abandons his or her neutral role; (3) when the affidavit is so lacking in indicia of probable cause that official belief in its existence is objectively unreasonable; and (4) when the warrant is so facially deficient that executing officers cannot reasonably presume it to be valid." *Id.* (citing *Leon*, 468 U.S. at 914, 923). Here, the parties are focused on the first exception to the presumption of good faith reliance on a warrant. That is, whether the affiant knowingly or recklessly misleads the magistrate judge with false information. Therefore, the Court turns next to a discussion of what Detective Knowlton as well as the other Salinas Police Department officers knew or should have known.

29

### b. Detective Knowlton and the Salinas Police Department Officers Had No Knowledge and May Not Be Charged with Knowledge of Agent Franco's Negligence

In *Leon*, the United States Supreme Court advised that "[i]t is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination." 468 U.S. at 923 n.24. Therefore, in the section that follows, the Court analyzes both the knowledge and the objective reasonableness of every officer involved in the chain leading to the search of Skates's residence because if the record demonstrates that the affiant or the executing officers knew of Agent Franco's negligence, that information would require the Court to suppress. *See also Krull*, 480 U.S. at 348–49 ("[E]vidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" (citation omitted)). However, as discussed below, the Court finds that all of the officers credibly testified they had no knowledge of Agent Franco's negligence, and their lack of knowledge was objectively reasonable given the structure of the communication and the fast-paced nature of the investigation.

### i. Agent Franco's Communication with Agent Aguirre

The Court's analysis begins with Agent Franco. The Court has already determined that Agent Franco was negligent in her search for Skates. Agent Franco used a pen register and trap and trace device, real-time cell-site location information, and a cell-site simulator, in combination with information from a confidential informant, surveillance, and database checks to locate Skates and his residence. Agent Franco, however, failed to read the Salinas Police Department's expired § 2703(d) electronic communication court order, failed to apply for a Pen/Trap Statute order, and failed to obtain a § 2703(d) order for cell-site location information. *See supra*, Section III.B.1.

Nonetheless, there is no evidence in the record that Agent Franco's Fourth Amendment violation was communicated to Agent Franco's supervisor, Agent Aguirre, who was the Bureau officer responsible for communicating with the Salinas Police Department, or to the Salinas Police Department. Indeed, the record is devoid of evidence that Agent Franco told Agent Aguirre the

30

1    search methods or spoke to any Salinas Police Department officers about her search. Instead,

2    information about the Bureau's search was communicated from Agent Franco to Bureau Agent

3    Aguirre; from Agent Aguirre to Salinas Police Department Officers Salinas and Zuniga; from

4    Officers Salinas and Zuniga to Officer Parker; and finally, from Officer Parker to Detective

5    Knowlton, the warrant affiant.

6         The Court finds that the communication structure among the Bureau's agents and to the

7    Salinas Police Department was reasonable. *See Guerra v. Sutton*, 783 F.2d 1371, 1375 (9th Cir.

8    1986) ("Law enforcement officers and agencies are entitled to rely on one another to a certain

9    extent."). Agent Franco and her partner, Agent Marquez, explained the Bureau's organizational

10   structure. The agents testified that each Bureau agent typically had four or five case assignments a

11   week for the Special Investigation Unit. Hearing Transcript at 215:16–216:5. The Bureau agents

12   would collect information and communicate it to their supervisor who then would communicate

13   the information to the agency that had requested the Bureau's assistance. *Id.* at 22:18–20, 108:20–

14   109:5, 128:22–129:11, 215:23–216:5. Here, the Bureau received the Salinas Police Department's

15   request for assistance on June 8, 2011 and located Skates on June 9, 2011. Agent Franco's

16   supervisor was Agent Aguirre, and Agent Aguirre was in charge of communicating with the

17   Salinas Police Department. Officer Salinas was the Salinas Police Department point of contact for

18   the Bureau.

19        At the evidentiary hearing, Agent Franco testified that she did not communicate her search

20   methods to her supervisor, Agent Aguirre, because she believed there "was no need to" because

21   Agent Franco understood that Agent Aguirre already "knew" what everyone's role on the

22   Bureau's team was. *Id.* at 132:25–133:4, 142:8–18; 163:9–25–164:16. Further, the record lacks

23   evidence that Agent Franco told Agent Aguirre of her negligence. Agent Franco's failure to

24   communicate appears reasonable given that, as discussed above, Agent Franco herself did not

25   know of, or recognize, any deficiencies in her search. There is otherwise no evidence in the record

26   as to what Agent Aguirre knew regarding Agent Franco's search methods because Agent Aguirre

27   did not submit a declaration, nor did he testify at the evidentiary hearing. The government

28

United States District Court
Northern District of California

represented that Agent Aguirre is retired and does not remember the events surrounding the search for Skates. *Id.* at 22:16–17. Moreover, the Court found Agents Franco and Marquez's testimony credible.

### ii. Agent Aguirre's Communication with Officers Salinas and Zuniga; and Officers Salinas and Zuniga's Communication with Officer Parker

The record reflects that Agent Aguirre communicated directly with Officer Salinas of the Salinas Police Department regarding the Bureau's search for Skates. In particular, Agent Aguirre supplied the Upland residence address to Officer Salinas and explained that the Bureau had taken Skates into custody. *See, e.g., id.* at 54:1–55:4. Officer Salinas testified that he does not recall whether or not Agent Aguirre told Officer Salinas about the investigative methods the Bureau used to locate Skates. *See id.* at 55:5–22; Salinas 9/14/18 Decl. ¶ 4, 8. However, Officer Salinas acknowledged that he was aware that the Bureau typically employed methods that "involved cell phone technology." Hearing Transcript at 65:23–25. Although Officer Salinas acknowledged that he recalls learning at some point that the Bureau used a cell-site simulator, he does not recall from whom or when he learned that information, and he testified that he believed that Bureau agents had the requisite legal authority to use the cell-site simulator. *Id.* at 58:1–14; Salinas 9/14/18 Decl. ¶¶ 6, 11. Moreover, the Bureau's cell-site simulator pinged for the first time only *after* the Bureau located Skates, meaning the cell-site simulator did not contribute new information in the search for Skates and his residence. Hearing Transcript at 184:4–8; Franco 9/14/18 Decl. ¶ 13.

Officer Salinas also recalled sending the electronic communication court order to the Bureau's Agent Aguirre early on June 9, 2011, at around 10:48 a.m. Hearing Transcript at 58:8–23; Salinas 8/17/18 Decl. ¶ 8; Salinas 8/17/18 Decl., Ex. D. Officer Salinas testified that he was not aware of whether the Bureau used or expanded upon this court order. Hearing Transcript at 58:1–14.

Officer Salinas told his partner, Officer Parker, that the Bureau had arrested Skates and determined Skates's address in Upland. Salinas 9/14/18 Decl. ¶ 9. Officer Salinas testified that he

Case No. 15-CR-00285-LHK
ORDER DENYING DEFENDANT VICTOR SKATES'S RENEWED MOTION TO SUPPRESS

does not recall informing Officer Parker about the Bureau's use of a cell-site simulator or real-time cell-site location information. *Id.* ¶ 10; Hearing Transcript at 57:9–21.

Officer Salinas also testified that he may have had a quick conversation with Detective Knowlton, but that from the best of his recollection, he did not inform Detective Knowlton about the Bureau's methods, and that Officer Parker was ultimately the one to speak to Detective Knowlton about the Bureau's locating and arresting Skates. Salinas 9/14/18 Decl. ¶ 9; *see also* Hearing Transcript at 56:11–57:8, 65:7–14.

Officer Parker confirmed that he received updates about the Bureau's efforts from Officer Salinas. ECF No. 483-4 ("Parker Decl.") ¶ 3. Officer Parker also testified that he spoke to Officer Zuniga, who Officer Parker believed was in contact with the Bureau. *Id.*; Hearing Transcript 29:7–15. Both Officer Salinas and Officer Parker indicated that they believed that Officer Zuniga first contacted the Bureau for assistance in locating Skates. *See id.* at 26:23–27:3, 51:15–18, 52:9–15. However, Officer Salinas clarified that Officer Salinas became "the point of contact." *Id.* at 44:6–13, 51:51–20. Officer Salinas emailed the case synopsis and the Salinas Police Department's § 2703(d) electronic communication order to the Bureau. Salinas 8/17/18 Decl., Exs. B & D.

In any event, Officer Parker testified that he learned that the Bureau had located Skates and Skates's phone. Officer Parker testified that he learned that the Bureau was "employing some sort of technology, to locate Mr. Skates's cell phone," but that Officer Parker did not receive specific information about the methods the Bureau used, including whether the Bureau had utilized real-time cell-site location information. Parker Decl. ¶¶ 3–6, 9; Hearing Transcript at 29:7–25, 37:5–13. Instead, Officer Parker recalls learning only that the Bureau had a surveillance vehicle, and that Bureau agents had physically seen Skates in a white Ford Explorer before they arrested him near an apartment complex in Upland. Parker Decl. ¶¶ 5–6; Hearing Transcript at 28:18–24. Officer Parker provided updates to Detective Knowlton, including that the Bureau had located and arrested Skates and determined his address. Parker Decl. ¶ 7; Hearing Transcript at 28:25–29:6.

Case No. 15-CR-00285-LHK
ORDER DENYING DEFENDANT VICTOR SKATES'S RENEWED MOTION TO SUPPRESS

The Court found Officers Salinas and Parker's testimony credible. Based on the entire record, the Court finds that Officers Salinas and Parker had no knowledge and may not be charged with knowledge of Agent Franco's negligence.

### iii. Detective Knowlton Did Not Have Knowledge

The record shows that when Detective Knowlton prepared his affidavit, Detective Knowlton did not know about the Bureau's real-time cell phone tracking without a court order. During the evidentiary hearing, Detective Knowlton testified that mid-day on June 9, 2011, he was tasked with helping the investigation team by drafting a search warrant application and declaration, so that if Skates was arrested, the other Salinas Police Department officers could drive the more than 300 miles to Upland to search Skates's residence. Salinas 8/17/18 Decl. ¶ 10; Hearing Transcript at 86:19–88:17, 101:6–25. Detective Knowlton explained that he received information from Officer Parker to prepare the application and declaration. Knowlton Decl. ¶ 5; Hearing Transcript at 87:1–15, 94:16–20. This division of labor appears reasonable considering the circumstances, including that the Bureau arrested Skates at 5:00 p.m., on June 9, 2011; Salinas Police Department Officers Salinas and Parker were informed and began driving the 300 miles to Upland; and Detective Knowlton, who had been asked mid-day to start writing a search warrant, obtained a search warrant sometime after midnight on June 10, 2011, which was hours after Skates's arrest. The Salinas Police Department officers executed the search warrant at 1:00 a.m. on June 10, 2011. Indeed, "[l]aw enforcement officers and agencies are entitled to rely on one another to a certain extent." *Guerra*, 783 F.2d at 1375; *see also, e.g.*, *Baker v. McCollan*, 443 U.S. 137, 145–46 (1979) (explaining that "[a] reasonable division of functions between law enforcement officers, committing magistrates, and judicial officers . . . is entirely consistent with 'due process of law.'").

As Detective Knowlton wrote in his declaration and testified at the evidentiary hearing, he learned on June 9, 2011 only that the Bureau had used "undercover agents, a surveillance vehicle, and a cellular telephone connected to Skates" to locate Skates and his residence. Knowlton Decl. ¶¶ 5, 7, 9; Hearing Transcript at 89:1–90:2. Detective Knowlton was not informed that the Bureau

had used real-time cell-site location information or a cell-site simulator. Knowlton Decl. ¶ 9. Detective Knowlton testified that he learned from Salinas Police Department Officer Parker that law enforcement had obtained an electronic communication court order that authorized them to obtain data from Skates's cell phone. *Id.* ¶ 5. Detective Knowlton did not know who specifically had obtained the order nor did Detective Knowlton read the order. Hearing Transcript at 92:7–25. When asked about whether Detective Knowlton knew if the electronic communication court order had been adhered to, Detective Knowlton replied, "I didn't know what type of order it was, and I never – I never thought a second thought about it, that something hadn't been adhered to because he had been located." *Id.* at 103:9–11. During the hearing, Detective Knowlton further clarified that he believed the Bureau acted lawfully. *Id.* at 105:20–21 ("I don't have any information at this time that suggests that anyone violated the law.").

Using the information conveyed to him, Detective Knowlton ultimately wrote the following in his affidavit in support of a warrant:

> An electronic communication court order was obtained in an attempt to locate the Skates phone on June 7, 2011.[3] On June 9, 2011 Agents from California Department of Justice Bureau of Narcotics Enforcement located Skates and his cell phone at 435 W. 9th Street Apt. #C1 in Upland, CA and arrested him for his warrant.

Knowlton Aff. at 10.

The Court found Detective Knowlton's testimony credible. Based on the entire record, the Court finds that Detective Knowlton and the Salinas Police Department had no knowledge and may not be charged with knowledge of Agent Franco's negligence.

### iv. Detective Knowlton Was Permitted to Author the Affidavit Without Personal Knowledge

Having found that the evidence shows that Detective Knowlton had no knowledge and may not be charged with knowledge of Agent Franco's negligence, the Court notes that it was permissible for Detective Knowlton to author the affidavit without personal knowledge and to rely

---

[3] This date is given in error; the electronic communication court order was actually obtained on June 8, 2011.

Case No. 15-CR-00285-LHK
ORDER DENYING DEFENDANT VICTOR SKATES'S RENEWED MOTION TO SUPPRESS

on information from Officer Parker. Such division is reasonable in complex cases where there are many officers involved in the investigation and it is not possible for one person to have personal knowledge of all relevant facts.

For example, in a unanimous panel opinion joined by then-Judge Neil Gorsuch, the Tenth Circuit in *Campbell* reiterated that mere negligence in checking or recording the facts relevant to a probable cause determination does not warrant exclusion. *See United States v. Campbell*, 603 F.3d 1218, 1235–36 (10th Cir. 2010) (citing *Franks*, 438 U.S. at 170). In that case, the Tenth Circuit declined to exclude evidence obtained pursuant to a warrant when the officer affiant—a Gang Task Force officer—had no personal knowledge of the information presented in his affidavit and relied entirely on information provided by other law enforcement officers (WPD officers), and those WPD officers failed to report all the results of the murder investigation that was mentioned in the affidavit, including that eyewitnesses had identified two other murder suspects besides the defendant. *Id.* at 1222–28. The Tenth Circuit emphasized that in *Campbell*, the Gang Task Force officer affiant did not review the WPD file, did not review the debriefings of the confidential witnesses, and never personally reviewed any specific gang information to confirm gang membership by the defendant. *Id.* at 1226.

*Campbell* directs the Court to find in the instant case that Detective Knowlton was permitted to have no personal knowledge of the information that he presented in his affidavit because Detective Knowlton was permitted to receive his information regarding Skates's address and the search for Skates from Officer Parker. In that same vein, like the affiant in *Campbell*, Detective Knowlton did not need to personally review the file, including the electronic communication court order obtained by the Salinas Police Department. *See id.* at 1226.

### c. Agent Franco's Negligence Was Isolated from the Warrant, Rendering Suppression Inappropriate

Finally, having found that the facts demonstrate no knowledge or culpability on the part of the Salinas Police Department officers, the Court turns to the important question of whether the facts warrant application of the good faith exception to the exclusionary rule. Put differently, the

36

Court addresses whether, in light of Agent Franco's negligence, the Court should suppress. The Court concludes that suppression is not warranted under the facts of this case because Agent Franco's negligence was isolated and that Salinas Police Department Officers did not have knowledge and may not be charged with knowledge of Agent Franco's negligence.

Most recently, in *Davis*, the United States Supreme Court discussed its good faith cases to date, and explained that "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Davis*, 564 U.S. at 238 (2011) (citations and internal quotation marks omitted). Although the isolated negligence question was not at issue in *Davis*, the United States Supreme Court referenced its prior decision in *Herring*.

In *Herring*, the United States Supreme Court considered the situation where a defendant sought to suppress evidence recovered from his person when an officer conducted an arrest and search incident to arrest in reliance on a Coffee County clerk's assertion that the defendant had an outstanding warrant. 555 U.S. at 137. The Coffee County clerk had based her assertion on a Dale County law enforcement employee's negligent bookkeeping entry, which falsely indicated that the defendant had an active arrest warrant. *Id.* at 138. The United States Supreme Court affirmed the Eleventh Circuit's finding that the arresting officers were innocent of any wrongdoing; that Dale County's failure to update the records was merely negligent; and that the benefit of suppression would be marginal or nonexistent in such a situation. 555 U.S. at 138–39. In particular, the *Herring* court held that the good faith exception applied and declined to suppress the evidence despite the "negligent police miscommunications" because "the error was the result of isolated negligence attenuated from the arrest." 555 U.S. at 137, 144–45.

The Ninth Circuit later considered *Herring* in its decision, *United States v. Camou*, 773 F.3d 932 (9th Cir. 2014). In *Camou*, the Ninth Circuit explained that the *Herring* decision was based on the fact that the *Herring* "officer was not negligent himself; the negligence was two degrees removed from the officer" and the "officer *reasonably relied on* an external source, which

Case No. 15-CR-00285-LHK
ORDER DENYING DEFENDANT VICTOR SKATES'S RENEWED MOTION TO SUPPRESS

turned out to be erroneous." *Camou*, 773 F.3d at 945 (emphasis in original) (citing *Herring*, 555 U.S. at 137).

Applying the lessons from the above cases, the Court finds that Detective Knowlton is not himself negligent because of Agent Franco's negligence. Detective Knowlton's involvement as the affidavit affiant is attenuated and at least four degrees removed from Agent Franco's search for, and arrest of, Skates. Moreover, as discussed above, there is no evidence demonstrating that any officers in the chain (including Agent Franco herself) knew of Agent Franco's negligence, and it was reasonable for the officers to have relied on one another.

Further, any negligence in the chain of communication, if at all, does not compel this Court to suppress. *See Herring*, 555 U.S. at 145 ("Under *Franks*, negligent police miscommunications in the court of acquiring a warrant do not provide a basis to rescind a warrant and render a search or arrest invalid."). For instance, to the extent it could be said that the Salinas Police Department officers should have further inquired into the Bureau's methods, such a finding would not impact the Court's analysis because, as already discussed, mere negligence in checking or recording the facts relevant to a probable cause determination does not warrant exclusion. *See Campbell*, 603 F.3d at 1235–36 (citing *Franks*, 438 U.S. at 170).

Similarly, any negligence on the part of the Bureau in not fully communicating their search methods to the Salinas Police Department would not justify suppression. Indeed, an error can be negligent, but it cannot be deliberately misleading or recklessly indifferent to the truth. *See, e.g.*, *Campbell*, 603 F.3d at 1226 (citing *Herring*, 129 S. Ct. at 702, 704); *see also id.* at 1224 ("[T]here was nothing that would indicate deliberately misleading information, or information provided to the magistrate with reckless indifference to the truth."). In *Campbell*, for instance, the Tenth Circuit found the district court did not clearly err in declining to suppress when the district court could have "permissibly concluded that the less than seamless communication among members of the Gang Task Force and the WPD resulted from negligence rather than reckless indifference to the truth or a deliberate intent to deceive the magistrate." *Id.* at 1229.

Importantly, in the instant case, the record reflects that Agent Franco did not deliberately

38

or recklessly conceal her search, but instead subjectively believed her search was lawfully conducted. In light of this, Agent Franco's failure to provide details to her supervisor and the Salinas Police Department look more like the "negligent miscommunications" identified in *Herring* and *Campbell*. Similarly, the resulting omissions in the communications between Agent Aguirre and Officer Salinas, the communications between Officers Salinas and Zuniga and Officer Parker, and ultimately the communications between Officer Parker and Detective Knowlton fail to amount to anything more than negligence. This is so because there is no evidence that the Salinas Police Department had knowledge and may not be charged with knowledge of Agent Franco's unauthorized use of real-time cell-site location information. There also is no evidence that the Salinas Police Department knew of any pattern of constitutional violations by Agent Franco or the Bureau. In fact, the officers testified that the Bureau was known to have expertise in the area of cell phone tracking; therefore, the officers reasonably presumed that the Bureau would have known the legal requirements and complied with them. *See, e.g.*, *Campbell*, 603 F.3d 1225 ("It is only when [an officer's] reliance was wholly unwarranted that good faith is absent." (citation omitted)). Hearing Transcript at 27:3–12, 31:1–19, 61:2–9.

Finally, exclusion is not warranted where there is no evidence of recurring or systemic negligence. *See, e.g.*, *Herring*, 555 U.S. at 147–48 ("[W]e conclude that when police mistakes are the result of negligence such as that described here, rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not 'pay its way.'"); *Campbell*, 603 F.3d at 1235–36 (holding that defendant "has demonstrated at most a *single* instance of an arguably negligent breakdown in communication among the WPD. He has not demonstrated what the Supreme Court appears to have indicated is required—'*recurring* or *systemic* negligence.'"); *see also Strieff*, 136 S. Ct. at 2063 (discussing that there was no indication that the officers "unlawful stop was part of any systemic or recurrent police misconduct."). In the instant case, like *Herring* and *Campbell*, the record is devoid of evidence that the Bureau and the Salinas Police Department's miscommunication was anything but an isolated incident of negligence. Nothing in the record suggests that Agent Franco had a pattern of conducting unlawful searches and failing to

39

convey the details of those searches to other officers or agencies that solicited the Bureau's help. Moreover, nothing in the record suggests systemic negligence on the part of Salinas Police Department officers to gather information or to provide that information to their warrant affiants. Were evidence of recurring or systemic negligence to exist, *Herring* and *Campbell* would compel this Court to suppress.

The Court recognizes that its ruling poses a risk that police departments may refrain from conveying information to their counterparts to evade suppression issues. The same risk existed in the United States Supreme Court's decision in *Herring* and the Tenth Circuit's decision in *Campbell*. *See, e.g.*, *Campbell*, 603 F.3d at 1229 ("[T]he police may not insulate one officer's deliberate or reckless misstatement or material omission simply by relaying it through an officer-affiant personally ignorant of its falsity of existence."); *Herring*, 555 U.S. at 146 ("If police have been shown to be reckless in maintaining a warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests, exclusion would certainly be justified under our cases should such misconduct cause a Fourth Amendment violation. . . . Petitioner's fears that our decision will cause police departments to deliberately keep their officers ignorant . . . are thus unfounded."). The *Herring* and *Campbell* courts addressed this risk by citing that the record lacked any evidence of this type of purposeful insulation. In the instant case, the Court has scoured the record and has found no evidence of purposeful insulation.

In sum, the Court finds that this case involves "isolated negligence," such that "the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Davis*, 564 U.S. at 238. The Court therefore declines to suppress.

### d. Salinas Police Department Officers Executed the Search Warrant in Good Faith

Finally, the Court turns to the Salinas Police Department's execution of the search warrant. The Court finds that Salinas police officers who executed the search warrant and conducted the search of the Upland residence also did not act objectively unreasonably in relying on the search warrant. Although the Bureau located Skates, Bureau agents did not conduct the search of Skates's

40

residence but simply locked down the residence while the Salinas Police Department secured a warrant. Franco 8/17/18 Decl. ¶ 12. Officer Salinas and other Salinas police officers traveled to Upland and, once the warrant was issued, searched the Upland residence pursuant to that warrant. Salinas 8/17/18 Decl. ¶ 9. As already discussed, no facts suggest that Officer Salinas or any of the members of his team knew of the Bureau's real-time cell phone tracking without a court order. In light of this, the Court has no basis to conclude that the "officer[s] had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Leon*, 468 U.S. at 919 (citation omitted); *see also Herring*, 555 U.S. at 145 ("'Our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" (citation omitted)).

Additionally, Skates's citation to *Groh v. Ramirez*, 540 U.S. 551, 557 (2004), to challenge the sufficiency of what Detective Knowlton wrote in his affidavit in support of the warrant has no application here. In *Groh*, the United States Supreme Court reiterated that "a warrant may be so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." 540 U.S. at 564. Here no such facial invalidity exists. This Court's previous order determined that there was "no deficiency in the search warrant or supporting search warrant affidavit so glaring that the officers could not reasonably rely on the warrant to conduct the search of the Upland residence." ECF No. 386 at 11. More specifically, the Court rejected Skates's contentions that the search warrant was conspicuously lacking in indicia of probable cause with regard to Skates's connection to the Upland residence and the evidence to be found there. *Id.* at 6–8.

This Court's previous order also found unpersuasive Skates's argument that the search warrant was invalid because it "relied upon the electronic communication court order, which presumably required less than probable cause." *Id.* at 9. As the Court previously explained, and discussed above, even assuming the United States Supreme Court's decision in *Carpenter* would invalidate the search authorized by the June 8, 2011 electronic communication court order, there

Case No. 15-CR-00285-LHK
ORDER DENYING DEFENDANT VICTOR SKATES'S RENEWED MOTION TO SUPPRESS

was no such binding authority when the Salinas Police Department sought and obtained the order under § 2703 in June 2011. *See Blake*, 2018 WL 3974716, at *2 (collecting cases that have "declined to suppress evidence arising out of a pre-*Carpenter*, routine acquisition of cell-site location information pursuant to the Stored Communications Act"). As with search warrants, officers can reasonably rely in good faith on subsequently invalidated statutes. *Krull*, 480 U.S. at 350. Therefore, there was no obvious deficiency that prevented the Salinas Police Department officers from relying in good faith on the search warrant here, and the Court declines to suppress the fruits of their search of the Upland residence.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Skates's renewed motion to suppress.

**IT IS SO ORDERED.**

Dated: March 1, 2019

LUCY H. KOH
United States District Judge

Case No. 15-CR-00285-LHK
ORDER DENYING DEFENDANT VICTOR SKATES'S RENEWED MOTION TO SUPPRESS